## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOBBY KENNETH WILLIAMSON, | ) | |
| | ) | Civil Action No. 12 – 785 |
| Plaintiff, | ) | |
| | ) | District Judge David S. Cercone |
| v. | ) | Chief Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| CO II ROBERTS, DARLENE | ) | |
| LINDERMAN, UNIT MANAGER | ) | |
| JOSEPH F. TREMPUS, SHAWN | ) | |
| TECH, and CHUCK ROBERTS, | ) | |
| | ) | |
| Defendants. | | |

## <u>MEMORANDUM OPINION</u>

March 12, 2013

Pending before the Court is a Motion to Dismiss by Defendants CO Roberts, Darlene Linderman, Joseph Trempus, and Chuck Roberts filed on August 14, 2012. (ECF No. 42.) On January 2, 2013, the Court ordered that the Motion to Dismiss would be treated as a Motion for Summary Judgment only with respect to the issue of whether Plaintiff exhausted his administrative remedies prior to filing this lawsuit. (ECF No. 55.) Plaintiff was given several extensions of time by which to file a response to the pending motion, but instead he filed a Counter Motion for Summary Judgment on March 5, 2013. (ECF No. 70.) For the following reasons, Defendants' will be granted summary judgment and Plaintiff's counter motion will be denied.

## I.      Background and Allegations

Plaintiff is currently serving a life sentence for crimes including first-degree murder.  He initiated this action in the Eastern District of Pennsylvania on August 2, 2011.  He named approximately fifty defendants, alleging civil rights violations in connection with his criminal conviction and subsequent attempts to clear his name and to be transferred to a prison in the United Kingdom.  *See, generally,* (Complaint, ECF No. 1.)  On October 6, 2011, the Eastern District dismissed the claims against the majority of the named defendants as time-barred.  (ECF No. 9.)  Upon motion of the remaining defendants, this case was subsequently transferred to this Court on May 11, 2012.  (ECF Nos. 33, 34.)

Plaintiff's claims against the remaining defendants stem from allegations that an affidavit and three-page handwritten document were lost or destroyed, legal mail was opened outside of his presence, international telephone numbers were intentionally blocked, and that he was wrongfully denied an international transfer to the United Kingdom.  Specifically, Plaintiff alleges that on July 17, 2009, a Mr. Palram Sukie, an alleged eyewitness to the crimes for which Plaintiff was convicted, mailed him an affidavit from London.  (ECF No. 1 at ¶ 126.)  Plaintiff states that he mailed the Sukie affidavit to the British Consulate General's Office in New York City but that the affidavit was mailed back to him and received by the SCI-Fayette mailroom on July 30, 2009.  (Id. at ¶ 126.)  At this point, Plaintiff presents differing theories as to what happened.  He alleges that mailroom staff logged the mail as legal, confidential or privileged, but opened, searched, read and lost the Sukie affidavit.  (Id. at ¶ 101.)  However, he also alleges that mailroom staff did not log the mail as legal, confidential or privileged and that it may have been opened, read, and misplaced by Defendant CO Roberts or some other worker on J-Block.  (Id. at ¶¶ 102, 126.)  He complains that if mailroom staff did not log the mail as legal, confidential or

privileged, they should have because he previously and subsequently received mail from the British Consulate General's Office which was designated as such.  (Id. at ¶ 117.)  Plaintiff claims that the Sukie affidavit would have assisted in his petition for post-conviction relief filed on September 21, 2009.  (Id. at ¶ 129.)  However, he also states that his petition would have failed, regardless of the affidavit, based on the unavailability of the trial transcript.  (Id.)  Additionally, Plaintiff alleges that he submitted an envelope for mailing to London, England on September 7, 2010, which contained a three-page handwritten document by another alleged witness, a Mr. Harold Taylor.[1]  (Id. at ¶ 113.)  The envelope was allegedly returned to him without the Taylor document.  (Id.)

Next, Plaintiff alleges that on September 28, 2010, he received mail from the PCRA Unit of the Criminal Justice Center in Philadelphia, Pennsylvania, which was opened outside of his presence.  (Id. at ¶ 114.)  When Plaintiff inquired as to why the mail was opened, he was informed by Mailroom Supervisor Defendant Linderman that, pursuant to Department of Corrections policy, the mail was not considered privileged because it did not come from a court or an attorney.  (Id.)  Plaintiff claims that the PCRA Unit is an arm of the court, and also claims that mailroom staff processed mail from the British Consulate General's Office and Fair Trial International as being privileged and that mail was not from either a court or an attorney.  (Id.)

Plaintiff next alleges that Intelligence Captain Defendant Trempus and Defendant ShawnTech blocked his international calls to London, preventing him from investigating his criminal conviction and locating Mr. Sukie.  (Id. at ¶¶ 115-16, 130.)  He also alleges that his attempts to add Fair Trial International's telephone number to his approved list of phone

---

[1] Plaintiff refers to this individual as Harold Taylor but also refers to an individual by the name of Harold Thompson.  Based on a reading of the Complaint, the Court assumes that this is the same individual and will refer to him herein as Harold Taylor.  See (ECF No. 1 at ¶¶ 100, 113, 126.)

numbers in May and June 2011 were not adequately addressed by Defendant Trempus, and that on July 12, 2011, all of his international telephone numbers to London, England were removed from his approved list without his permission.  (Id. at ¶ 116.)  Finally, Plaintiff alleges that Assistant Records Administrator Defendant Roberts denied his application for International Prisoner Transfer on March 23, 2011, to cover up interference by Department of Corrections' employees or to hinder Plaintiff's investigation of his criminal conviction.  (Id. at ¶¶ 126, 130.)

## II.    Legal Standard

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact.  National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  The inquiry, then, involves determining "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Brown v. Grabowski,

4

922 F.2d 1097, 1111 (3d Cir. 1990) (quoting <u>Anderson</u>, 477 U.S. at 251-52).  If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249-50.  Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form.  *See* Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324; <u>J.F. Feeser, Inc., v. Serv-A-Portion, Inc.</u>, 909 F.2d 1524, 1542 (3d Cir. 1990).

**III.**   **Exhaustion of Administrative Remedies**

As a ground for dismissal, Defendants asserted that Plaintiff failed to exhaust his administrative remedies prior to filing his Complaint.  As previously noted, this portion of Defendants' motion was converted into a Motion for Summary Judgment, to which Plaintiff responded in opposition by filing a Counter Motion for Summary Judgment.

1.   The Exhaustion Requirement

Through the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended 42 U.S.C. § 1997e(a) to prohibit prisoners from bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law, until such administrative remedies as are available are exhausted.  Specifically, the act provides, in pertinent part, as follows:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  Exhaustion is required under this provision regardless of the type of relief sought and the type of relief available through administrative procedures.  *See* <u>Booth v. Churner</u>,

532 U.S. 731, 741 (2001).  In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes.  *See* Porter v. Nussle, 524 U.S. 516, 532 (2002).  Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies prior to filing the action.  *See* Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").

The PLRA also mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court.  Woodford v. Ngo, 548 U.S. 81, 93 (2006).  "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjunctive system can function effectively without imposing some orderly structure on the course of its proceedings."  Id. at 90-91.  Such requirements "eliminate unwarranted federal-court interference with the administration of prisons, and thus seek[] to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'"  Id. at 93 (quoting Porter, 534 U.S. at 525).  Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective . . . appeal."  Id. at 83; *see also* Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion).  Courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal courts.  *See, e.g.,* Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v. Beard, 183 F. App'x 178 (3d Cir. 2006).

This broad rule favoring full exhaustion admits of one, narrowly defined exception.  If the actions of prison officials directly caused the inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement.  *See* Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000) (Section 1997e(a) only requires that prisoners exhaust such administrative remedies "as are available").   However, case law recognizes a clear "reluctance to invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires."  Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002).  Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." Davis, 49 F. App'x at 368; *see also* Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp, 219 F.3d at 281 (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and correctional officers impeded filing of grievance).

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances, inmate requests to excuse a failure to exhaust are frequently rebuffed by the courts.  Thus, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement.  Harris, 149 F. App'x at 59.  Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him.  Davis, 49 F. App'x at 368.  Thus, an inmate's

confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. Oliver v. Moore, 145 F. App'x 731 (3d Cir. 2005) (failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

No analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirement, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007).

2.  Pennsylvania Department of Corrections Grievance Procedure

Within DC-ADM 804, the Inmate Grievance System Policy, the Pennsylvania Department of Corrections established a three-step Inmate Grievance System to provide inmates with an avenue to seek review of problems that may arise during the course of confinement. Pursuant to DC-ADM 804, after an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review. This must occur within fifteen days after the events upon which the claims are based. Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Facility

Manager of the institution.[2]  Within fifteen days of an adverse decision by the Facility Manager,

an inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals

("SOIGA").  An appeal to final review cannot be completed unless an inmate complies with all

established procedures.  An inmate must exhaust all three levels of review and comply with all

procedural requirements of the grievance review process in order to fully exhaust an issue.  *See*

<u>Booth v. Churner</u>, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance

review process); <u>Ingram v. SCI Camp Hill</u>, No. 08-23, 2010 U.S. Dist. LEXIS 127124, at *21-25

(M.D. Pa. Dec. 1, 2010) (same).

    3.  <u>Analysis</u>

    In support of their position that Plaintiff failed to exhaust his administrative remedies,

Defendants have submitted the Declaration of Rhonda House, the Superintendent's Assistant and

Grievance Coordinator at SCI-Fayette.  (ECF No. 43-1 at 2-4.)  House reviewed Plaintiff's

grievance history in connection with the allegations made in Plaintiff's Complaint and states as

follows.  With respect to his allegation that the mail he received from the PCRA Unit in

Philadelphia was opened outside of his presence, Plaintiff filed Grievance 292692 on October

16, 2009.  (ECF No. 43-1 at 13.)  That grievance was denied (ECF No. 43-1 at 12) but Plaintiff

never appealed to the superintendent.  With respect to his allegation that someone removed the

Sukie affidavit from his returned mail on July 30, 2009, Plaintiff filed Grievance 285627.  (ECF

No. 43-1 at 19-20.)  However, that grievance was rejected as untimely because it was not

submitted until August 24, 2009.  (ECF No. 43-1 at 15-18.)  With respect to Plaintiff's allegation

that Harold Taylor's three-page handwritten document was removed from a letter that was

---

[2]     The policy was last amended on December 1, 2010.  The previous version of the policy only allowed ten working days to appeal an adverse initial review decision to the facility manager.

returned to him, Plaintiff filed Grievance 339691.  (ECF No. 43-1 at 10.)  While Plaintiff did appeal the denial of that grievance to the superintendent (ECF No. 6-9), he did not appeal to final review.  With respect to his problems with making international phone calls, Plaintiff filed Grievance 355271 on February 24, 2011, and repeat Grievance 359426 on March 29, 2011. (ECF No. 43-1 at 22-27.)  However, he failed to appeal the denial of either grievance to final review.  Plaintiff also filed Grievance 385372 on October 2011, after his Complaint was filed, and referred to problems he was having with his London numbers.  (ECF No. 43-1 at 29-30.) However, he did not appeal the denial of that grievance to the superintendent.  Finally, Plaintiff did not file a grievance concerning the denial of his international transfer, although he did, however, file Grievance 282243 in July 2009, questioning the status of his application.  (ECF No. 43-1 at 32-39.)

Plaintiff was afforded several opportunities to respond to Defendants' motion, including their argument that he did not exhaust his administrative remedies with respect to his claims.  Plaintiff was initially given a deadline of September 14, 2012 to file his response (Text Order dated August 16, 2012) and was subsequently granted an extension with a new deadline of November 16, 2012 (ECF No. 47).  He was thereafter granted a second extension with a new deadline of December 30, 2012.  (Text Order dated December 3, 2012.)  Plaintiff filed another request for extension of time on December 28, 2012, but the motion was later dismissed as moot when the Court converted the portion of Defendants' motion concerning exhaustion into a motion for summary judgment and informed Plaintiff that he had until February 15, 2013 to respond to the exhaustion issue.  (Text Order dated January 2, 2013.)  That deadline was later extended until March 4, 2013, pursuant to Plaintiff's request.  (ECF No. 66.)  In response, Plaintiff filed a Counter Motion for Summary Judgment wherein he contends that he has no way to demonstrate

that he exhausted his claims because he is being denied access to his boxes containing the

necessary legal property.  (ECF No. 70.)  This argument has been the basis for his many requests

for extensions since September 2012, and, despite Defendants' contention that Plaintiff has been

presented with ongoing opportunities to retrieve the necessary legal materials, the Court has

accommodated his requests for over six months.  Notwithstanding the fact that the record does

not support Plaintiff's position regarding denial of access to his legal property, what is even more

fatal to his argument is his admission that he did, in fact, have access to the documents he needed

for fifteen days.  (ECF No. 70 at 8.)  This is more than sufficient time to respond to Defendants'

argument, and to come forward with the record evidence needed to defeat summary judgment on

this issue.  However, he did not, and, as such, the factual record will be taken as presented by the

Defendants.  Because the record clearly establishes that Plaintiff did not exhaust his

administrative remedies with respect to any of his claims against the moving Defendants, or

against Defendant ShawnTech, summary judgment will be granted in their favor and Plaintiff's

counter motion will be denied.[3] An appropriate order will follow.

s/ David Stewart Cercone
David Stewart Cercone,
United States District Judge

cc:  Bobby Kenneth Williamson
    DQ-9200
    Box 9999
    LaBelle, PA  15450

---

[3] The Court notes that while Defendant ShawnTech has filed an Answer to Plaintiff's Complaint (ECF No. 28), a scheduling order has not yet been entered.  A *sua sponte* grant of summary judgment in their favor is nevertheless appropriate based upon the discussion of the exhaustion of administrative remedies issue as raised by the moving Defendants.  *See* Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); DL Resources, Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 223 (3d Cir. 2997).  In this case, Plaintiff had notice and opportunity to be heard when the Court converted the moving Defendants' Motion to Dismiss into a Motion for Summary Judgment with respect to the issue of exhaustion and granted him numerous extensions to reply to said argument.

(Via U.S. Postal Mail)

Counsel of Record
(Via ECF Electronic Mail)